UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| LOCAL 676, UA OF SPRINKLER | : | 3:10-cv-123 (VLB) |
| FITTERS AND APPRENTICES OF | : | |
| CONNECTICUT, | : | |
| RHODE ISLAND, & WESTERN | : | |
| MASSACHUSETTS, ET AL. | : | |
| | : | |
| v. | : | September 15, 2010 |
| | : | |
| UNITED ASSOCIATION | : | |
| OF JOURNEYMEN AND | : | |
| APPRENTICES OF THE | : | |
| PLUMBING AND PIPE FITTING | : | |
| INDUSTRY OF THE UNITED STATES | : | |
| AND CANADA, ET AL. | : | |

MEMORANDUM OF DECISION
DENYING THE PLAINTIFFS' [DOC. #5] MOTION FOR PRELIMINARY INJUNCTION

The matter before the Court is the Plaintiffs', Local 676, UA of Sprinkler

Fitters and Apprentices of Connecticut, Rhode Island, & Western Massachusetts

("Local 676"), John Livingstone, and Michael Livingstone (collectively

"Plaintiffs"), motion for a Preliminary injunction [Doc. #5].  The Plaintiffs seek to

enjoin Defendants United Association of Journeymen and Apprentices of the

Plumbing and Pipe Fitting Industry of the United States and Canada ("UA"), its

general executive board, William P. Hite, Kenneth Aurecchia, James Sullivan,

Kenneth Broadbent, Sid Stolper, Billy Borchert, and John Telford (collectively

"Defendants") from executing a consolidation order merging Local 676 with

another union, the Road Sprinkler Fitters Union No. 669 ("Local 669").  [Doc. #5].

1

The Plaintiffs argue that they are entitled to a preliminary injunction because a merger revoking Local 676's thirty-eight year charter will result in irreparable harm, and because they are likely to succeed on the merits in their claims that: the merger of Local 676 into Local 669 violates a 1972 court order and settlement agreement; the order to merge Local 676 into Local 669 was patently unreasonable and exercised in bad faith, therefore breaching UA's obligations pursuant to its constitution; and that a forced merger of Local 676 into 669 raises membership dues without a vote and otherwise disciplines the members of Local 676 in violation of 29 U.S.C. § 411(a)(3) and (5). [Doc #41]. The Defendants oppose the motion, arguing that the Plaintiffs' have not satisfied their burden of proving irreparable harm and likelihood of success on the merits. [Doc. #40]. For the reasons stated hereafter, the Plaintiffs' Motion for Preliminary Injunction is DENIED.

## 1. BACKGROUND

The Plaintiff Local 676 was chartered as an autonomous United Association Local Union on January 20, 1971 shortly before the initiation of a class action lawsuit and subsequent settlement agreement between Local 669 and Defendant UA. [Pl. Exh. R; Joint Exh. 51, 60]. Prior to the 1971 class action lawsuit, Local 669 and UA enjoyed a special relationship in which the UA retained a greater degree of control over Local 669 and its assets than it did over other local unions. [Joint Exh. 60]. Members of Local 669 became dissatisfied with its

lack of autonomy, and entered into negotiations with the UA. [Doc. #41]. The Plaintiffs contend that in "consideration for staving off an impending class action" the UA began settlement negotiations and agreed to conduct a hearing concerning the possible charter of a new local union in New England, resulting in UA's chartering of Local 676. [Doc. #41]. Members of Local 669 subsequently filed their noted lawsuit against the UA on November 5, 1971 and the parties immediately entered into a settlement agreement terminating their special relationship. [Joint Exh. 51, 60]. The agreement stated, inter alia, that:

> [T]he parties recognize that in consideration of the settlement of this suit the Defendants pursuant to consultation and/or agreement with the Plaintiffs counsel, have already taken the following preliminary actions leading to a termination of the special relationship that has existed between the Defendants and Local 669: . . . Conducted a hearing concerning the territorial jurisdiction of Local 669 in New England and issued a decision transferring portions of Local 669's jurisdiction in New England to a newly chartered sprinkler fitter local known as Local 676.

[Joint Exh. 60]. On March 9, 1972, the United States District Court for the District of Columbia approved the settlement agreement in an order that read in part: "This is a class action, brought by the plaintiffs individually and in their indicated representative capacities on behalf of all members of Local 669 and its successors . . ." [Id.]. The settlement agreement noted that Local 669 would become a "wholly autonomous local union on an equal footing with a [sic] other United Association local unions in accordance with the Constitution and By-Laws of the United Assocation" and neither the settlement nor the order approving it stated that Local 676 would be immune from consolidation and merger by the UA

3

[Id.].

The Defendants note that since its chartering, Local 676's jurisdiction has been altered by consolidation or merger on at least two occasions. [Doc. #40]. During November 1971, jurisdiction over Vermont was transferred from Local 676 to Local 669, and in July 1987, the UA transferred jurisdiction over Rhode Island to Local 676 from other local unions. [Id.].

Defendant Local 669 is based in Maryland and has over 8,000 members and jurisdiction over sprinkler markets in forty-six states. [Doc. #41; Pl. Exh. B]. In New England, Local 669 has jurisdiction over Maine, Vermont, New Hampshire, and parts of Southeastern Massachusetts. Local 669 is substantially larger and has cash reserves substantially greater than those of Local 676. Locals draw on cash reserves during economic downturns to provide financial support for its members and its operations. [Prelim. Inj. Hearing, Doc. #76]. Plaintiff Local 676 is based in Connecticut, and has jurisdiction over sprinkler markets in Connecticut, Rhode Island, and Western Massachusetts and select areas in Eastern Massachusetts. [Pl. Exh A]. The Plaintiffs note that Local 676 maintains a collective bargaining agreement with the National Fire Sprinkler Association ("NFSA") and also supplies labor to members of the Mechanical Contractors Association of Connecticut ("MCAC"), which are both employer associations. [Pl. Exh. H].

There are three additional unions related to sprinkler, plumbing, and pipefitting work with jurisdiction in New England. Local 777 is a plumbing and

pipefitting union with jurisdiction over the entire State of Connecticut, while Local 51 is a plumbing and pipefitting union with jurisdiction over Rhode Island and part of Massachusetts. Local 550 is a sprinkler fitting union with jurisdiction in Eastern Massachusetts and parts of New Hampshire. All three unions are affiliated with the UA. [Def. Exh. 13, pgs. 153-156].

The UA Constitution governs the relationship between the UA and its affiliated local unions and their members. [Joint Exh. 64]. Section 2 of the UA Constitution vests the UA with complete control over the trade and territorial jurisdiction of its affiliated locals, stating that "[t]o the United Association … is reserved the right to decide all matters pertaining to trade and territorial jurisdiction of its affiliated Local Unions, and no Local Union is conceded territorial jurisdiction other than the current working day in said territory" [Joint Exh. #64]. Section 84 of the Constitution governs the consolidation of local unions, stating that:

> Whenever, in the judgment of the General President, it is apparent that there is a superfluous number of Local Unions in any locality, and that a consolidation would be for the best interest of the United Association, locally or at large, he shall have the power to order Local Unions to consolidate and to enforce the consolidation of said Local Unions or said territory in one or more Local Unions, provided such course received the sanction of the General Executive Board.

[Id.]. Although Section 84 does not impose any procedural requirements, such as the right to conduct discovery, or to a hearing, the General President customarily directs that a hearing be held and allows the affected locals to present their positions prior to ordering a consolidation. [Def. Exh. 1]. The affected local is

also given the right to appeal the order, although while the appeal is pending, the local must comply with the consolidation order. Section 208 of the UA's Constitution notes that "[a]ny decision, unless otherwise provided for, made by the General Executive Board shall be subject to appeal to the following convention, if so desired, within sixty (60) days after notification of such decision is mailed to the parties." [Joint Exh. 64].

The Defendant represents that upon consolidation, merged members become full members of the new union, with the same rights and privileges, such as the right to vote, hold office, and participate in union affairs, as members of their new Local Union as they would have had in their predecessor Local. [Def. Exh. 1; Def. Exh. 11, pg. 143].

During 2008, the UA received complaints from MCAC about impediments to bidding for jobs, supplying workers, and increasing market share in Connecticut. The Defendant contends that MCAC complained that it was disadvantaged due to Local 676's small workforce, lack of a market recovery program ("MRF") which is used to help contractors that use union labor remain competitive with contractors that do not, its small number of apprentices, and a forecasted loss of journeymen and foremen due to attrition. [Doc. #40]. The Plaintiffs allege that these complaints were lodged during a "secret" meeting between the Executive Vice President of MCAC, John Barrasso ("Barrasso"), and the International Representative for the UA in New England, William Turner ("Turner"). [Doc. #41]. The two later met with John D. Wright ("Wright") the Administrative Assistant to

the President of the UA, at an MCA convention. [Pl. Exh. D, pg. 13]. The parties dispute whether this meeting concerned merely the alleged problems with Local 676, or whether the individuals also discussed merging Local 676 into Local 777. [Doc. #41]. Wright advised Barrasso to send a letter to UA General President William Hite ("Hite") addressing his concerns. [Pl. Exh. E, pgs. 25-26]. Some months later, Barrasso met with Turner in Mystic, Connecticut to show Turner the letter, during what the Plaintiffs characterize as a "secret" five-minute meeting, for which both men drove over an hour to attend. [Doc. #41; Pl. Exh. C, pg. 51]. Barrasso states that he held a "face-to-face" meeting with Turner because he believed "it was a courtesy that [he] owed to him as the international rep . . ." [Pl. Exh. C, pg. 51]. On December 10, 2009, Barrasso sent the letter to Hite addressing MCAC's concerns with Local 676. [Joint Exh. 1]. The letter was based largely on information taken from an NFSA "white paper"about the union. [Pl. Exh. C, 57-60]. The Plaintiffs allege that the NFSA report advocated a joint effort between the NFSA and Local 676 to address the NFSA's concerns rather than a merger, and that the Vice President of Labor Relations for the NFSA, Alexander Gettler ("Gettler"), sent a letter to Turner in protest of Barrasso's letter for mischaracterizing the white paper's findings. [Doc. #41, Joint Exh. 4].

On January 5, 2009, Local 676's Business Manager, Paul Lunney ("Lunney") was told that Turner had been assigned by Hite to investigate the problems expressed in Barrasso's letter. [Pl. Ex. F, pg. 27]. Lunney indicates that he asked Turner for a copy of Barrasso's letter during that conversation, but that

Turner declined to provide him with a copy. [Id.]. Lunney indicates that he later received a copy of the letter on January 23, 2009 after inquiring with Barrasso directly. [Id. at pg. 28].

The Plaintiffs also allege that during a January 7, 2009 telephone call, Turner indicated that there was "merger talk" and Lunney then called Gettler to inform him of the situation, and spoke with Kenneth Aurecchia ("Aurecchia"), UA Vice President of District 1 and a member of the UA General Executive Board, who allegedly told Lunney "[y]ou're screwed, [Turner] was never fond of Local 676 anyways." [Joint Exh. 30, pg. 57; Pl. Ex. F, pg. 50]. On March 23, 2009, Turner met with representatives from MCAC and NFSA to discuss the possibility of a merger between Locals 676 and 777. [Def. Exh. 13, pg. 59-60; Pl. Exh. D, pgs. 64-65]. The parties dispute whether the NFSA or Barrasso on behalf of MCAC organized the March meeting and who decided which of their member contractors would attend. [Doc. #59, pgs. 3-4]. The Defendants note that the NFSA expressed concern regarding a merger of 676 with 777 because of the likely impact on member pensions and potential pension withdrawal liability for NFSA contractors. [Pl. Exh. C, 89-90]. A merger with Local 669 was subsequently proposed, which both NFSA and MCAC were willing to support. [Joint Exh. 10, 11]. Deposition testimony reflects that Turner also met with representatives from Locals 676, 777, and 51, but the record does not indicate who was privy to these meetings. At the meetings Turner allegedly discussed the idea of a merger with the local union representatives that were present but no consensus was reached,

but Local 676 indicated its opposition to a merger. [Def. Exh. 9, pgs. 40, 77-78, 104-105]. Turner allegedly met with Lunney on March 25, 2009 and told him that Local 676 would be merged with Local 777. Lunney claims he tried to provide Turner with empirical data published by the UA, showing that Local 676 outperformed both Locals 777 and 669, and that a merger would injure both his members and the market as a whole, but was allegedly told "Local 669 or 777 those are your choices." [Id., 104-105]. At another meeting, the Plaintiffs claim that Lunney informed Turner that Local 676 was willing to sit down and address any issues that the UA or the contractors had, but that Turner rebuffed him, stating that the "train was going down the track." [Pl. Ex. F, pg. 104-105].

On April 7, 2009, Turner submitted a report to Hite describing his investigation. [Joint Exh. 13]. In the report, Turner noted an insufficient number of sprinkler fitters in the jurisdiction to perform the available work and alleged that Local 676 had not taken steps to expand its membership base. [Id.]. Turner also noted a lack of a MRF and asserted that Local 676 had failed to organize any new contractors or members during the past several years. [Id.]. Turner recommended that the General President consolidate Local 676 into Local 669. [Id.]. The Plaintiffs note that Turner's report relied heavily upon the NFSA's report rather than an independent investigation, and allege that Turner left out important information from the NFSA report. [Docs. ## 41, 59].

During June and early July 2009, interested parties met to discuss the proposed consolidation and Local 676 noted its continued opposition to a merger

and requested a copy of Turner's report [Docs. ##40-41]. When Lunney arrived at a June 8, 2009 meeting, a map was allegedly displayed on a table entitled "the New New England" showing the jurisdictional boundary lines of Local 676 replaced by Locals 669 and 550, which Lunney interpreted as a means to intimidate him. [Pl. Exh. N; Pl. Exh. O; Joint Exh. 30, pgs. 148-149]. The Plaintiffs note that Local 676 continually voiced a willingness to work out any concerns, and offered to expand its MRF by contributing $.50 an hour from its members' wages. [Joint Exh. 22]. Throughout this period, Local 676 also continued to request access to Turner's report, but did not receive a copy. [Joint Exh. 23].

On July 22, 2009, Hite notified Locals 676, 777, 669, and 550 that a hearing would be held on August 24, 2009 to consider the consolidation of Local 676 into Local 669. [Joint Exh. 24]. The notification letter included a copy of Turner's report, but failed to include its attachments. [Id.]. After notification of the hearing, Local 676 asked the UA to produce twenty categories of information it believed necessary to provide a proper defense and subsequently requested a postponement of the hearing date on August 11, 2009 after Hite failed to comply with Local 676's request for documentation. [Joint Exh. 25; Joint Exh. 26]. On August 20, 2009, Hite denied Local 676's request for a postponement and discovery, but provided a complete copy of Turner's report, including the exhibits previously omitted. [Joint Exh. 27; Joint Exh. 28; Joint Exh. 29]. The UA indicated that the initial failure to provide the full report was due to a clerical error. [Joint Exh. 29].

As scheduled, the hearing was held on August 24, 2009, and John Wende ("Wende"), Business Manager from UA Local 274 in New Jersey presided over its proceedings. [Joint Exh. 30; Joint Exh. 31; Joint Exh. 32]. The hearing lasted a full day, with multiple witnesses and over 400 pages of documents introduced into evidence. Lunney and Local 676 member Michael Livingstone testified during the hearing and indicated that Local 676 was denied access to Turner's Report until four days before the hearing, and that Local 676 was denied documents relating to other forced mergers within the past 10 years. [Id.]. Wende indicated a belief that information regarding forced mergers was irrelevant to the proceeding. [Id.]. The Plaintiffs contend that, during the hearing, Turner "failed to testify about the secret meeting he had with Wright and Barrasso earlier in the year" and "the other secret meeting he had with Barrasso in order to review the letter before it was sent." [Doc. #41]. The Plaintiffs further contend that Turner misrepresented the process and meetings that led to the proposed consolidations and failed to indicate the potential role Connecticut's apprenticeship regulations played in Local 676's criticized lack of growth. [Id.]. Barrasso also testified during the hearing and indicated that he had been "directed by his association" to write the letter that he submitted to UA. [Joint Exh. 30]. Barrasso also stated that contractors in MCAC were foregoing sprinkler fitter work because of Local 676's lack of manpower, but declined to give proof, noting that he feared repercussions. [Id.]. Local 676 introduced nineteen exhibits at the hearing in an effort to rebut the allegations of Turner's Report. [Id.]. Local

676 also introduced evidence to support its assertions that the merger would increase their annual dues by $2,464.08, that the UA had ranked Local 676 higher than Local 669, and that Local 676 had a higher active growth rate as well as a higher percentage increase in apprentices over the past 10 years. [Id.]. Local 676 also highlighted that, pursuant to state regulations, Connecticut apprenticeship programs were statutorily required to be sponsored  by an entity located in Connecticut, and argued that the Connecticut apprenticeship program would therefore be threatened because Local 669 was based in Maryland. [Id.]. Local 676 also introduced letters from building trade organizations, labor councils, the USA Sprinkler Fitter Association, and Local 676 members, to further supports its argument that a forced merger would be detrimental to the sprinkler fitter industry in Connecticut. [Id.]. Following the hearing, Local 676 submitted written requests for information from Hite, the NFSA, and Barrasso, which were denied. [Joint Exh. 34; Joint Exh. 36; Joint Exh. 38].

On January 8, 2010, Wende issued his decision that Local 676 should be merged into 669, basing it on a need to increase the number of apprentices, evidence that MCAC contractors were not bidding on sprinkler fitting work because of a lack of manpower, the lack of a MRF, and concerns about the size of Local 676's membership compared to the total number of licensed sprinkler fitters in Connecticut and Rhode Island. [Joint Exh. 49]. On January 16, 2010, Hite issued an order consolidating Local 676 into Local 669, concluding that there were too many local unions in the New England area and that the

consolidation would benefit the UA, locally and at large. [Id.]. The order directed that all assets, real property, and monies of Local 676, as well as any bona fide debts and liabilities, would become property of Local 669. [Id.]. It was also ordered that Local 669 would assume all contractual obligations, including collective bargaining agreements. [Id.]. The order was prepared by UA counsel, and signed by Hite, and  reflected his review of the record, report, and recommendation of the hearing officer. [Def. Exh. 11, pgs. 145-147].

Following the consolidation order, the Plaintiffs filed the instant suit, seeking injunctive relief. [Doc. #1]. The parties agreed to an expedited scheduling order [Doc. #25] and then commenced discovery, including the depositions of John Livingstone, Michael Livingstone, Paul Lunney, John Wright, William Hite, John Wende, William Turner, and John Barrasso. During March 3, 2010 deposition testimony, Lunney indicated that he was not aware of "any improper motive that Mr. Hite had in issuing his order of consolidation" and that he did not have any facts to suggest that Wende was "motivated by any improper considerations in the way he conducted the hearing." [Def. Exh. #9, pgs. 131-32]. Similarly, during March 1, 2010 deposition testimony John Livingstone conceded that he could not recall any facts, at least at that time, to support an argument that Hite "had an improper motive in issuing [h]is order of consolidation." [Def. Exh. #7, pgs. 81-82]. Lastly, during a March 2, 2010 deposition Michael Livingstone acknowledged that he was unaware of what Hite's motive was when he issued the consolidation order and that he did not have "independent facts

outside of the order of consolidation as to" an improper motive for Hite, Wende, or individual members of the General Executive Board [Def. Exh. 8, pgs 130-131]. Finally, the Court held a hearing on August 31, 2010 during which the parties had the opportunity to present arguments regarding the pending motion for preliminary injunction, cite to the extensive evidentiary record, and identify outstanding issues of material fact [Prelim. Inj. Hearing, Doc. #76].


## 2. DISCUSSION

### Standard of Law Regarding a Preliminary Injunction

 The Second Circuit has instructed that "a party seeking a preliminary injunction must meet the burden established by [the] now familiar test: 1) irreparable harm should injunctive relief not be granted and 2) either a likelihood of success on the merits, or sufficiently serious factual questions making a fair ground for litigation with a balance of hardships tipping in the movant's favor." Int'l Bhd. of Teamsters v. Local 810, 19 F.3d 786, 789 (2d Cir. 1994). Need for proof of irreparable harm is "more pronounced" when "the plaintiff establishes something less than probable success on the merits.'" Triebwasser & Katz v. American Telephone & Telegraph Co., 535 F.2d 1356, 1359 (2d. Cir. 1976). "[A] hearing is generally required on a motion for a preliminary injunction." Drywall Tapers & Pointers, Local 1974 v. Local 530 of the Operative Plasterers & Cement Masons Int'l Ass'n, 954 F.2d 69, 76 (2d Cir. 1992). However, "oral argument and testimony are not required in all cases." Hunnicutt v. Lantz, No. 3:07-cv-1422

14

(JCH), 2010 WL 419407 at *1 (D. Conn, Jan. 29, 1010). "Where . . . 'the record before a district court permits it to conclude that there is no factual dispute which must be resolved by an evidentiary hearing, a preliminary injunction may be granted or denied without hearing oral testimony.'" Id. (quoting 7 James W. Moore, et al., Moore's Federal Practice P 65.04[3] (2d ed. 1995); See also, Drywall Tapers, 954 F.2d at 77 (where the Second Circuit noted that a hearing is unnecessary where "the most significant factors [impacting the determination of injunctive relief] would have remained essentially unchanged by any additional evidence.")

## Consideration of Irreparable Harm

The Plaintiffs alleges irreparable harm should the Court not grant injunctive relief based on concerns that the merger will result in the transfer of its assets to Local 669, the loss of representation by their democratically elected union members and finally, the loss of the Local's proud history. [Doc. #41]. The Defendants claim that the Plaintiffs will not be irreparably harmed because of the availability of legal remedies should the Plaintiffs ultimately prevail, and further allege that the Defendants will be irreparably harmed should an injunction be granted, as an injunction "would directly undermine the UA's ability to govern its internal affairs, enforce its constitutional authority and directives, and carry out consolidation proceedings without the trappings of a formal trial," while allowing Local 676 to further deplete its assets and increase its liabilities before the

eventual merger. [Doc. #40].

Whether or not losing control over assets constitutes irreparable harm depends upon the parties' ability to restore the status quo, that is whether the to-be-merged union can recover its assets if the merger order is reversed. The Second Circuit has found that the loss of control over a local union's assets does not constitute irreparable harm, because "should [the local] ultimately prevail, it would be able to recover the assets." <u>San Filippo v. United Bhd. of Carpenters</u>, 525 F.2d 508, 512 (2d Cir. 1975). In contrast, the <u>San Filippo</u> decision has been limited to its facts by at least one district court, which noted that "the holding … was based in part on the Court's finding that the International would hear the appeal of the dissolved union and that the funds of the local would remain intact." <u>Mason Tenders Local Union 59 v. Laborer's International Union of North America</u>, 924 F.Supp. 528, 543 (S.D.N.Y. 1996). The <u>Mason Tenders</u> court found that a reorganization plan, consolidating ten unions into two newly chartered unions would render an appeal uncertain, "disperse the Local's membership, remove their elected officials from office, and confiscate their assets" and that "[t]hese circumstances constitute irreparable harm even if it is assumed that the Local's assets could be restored and their officers reinstated upon a successful appeal of the adoption of the Reorganization plan." <u>Id</u>. Other district courts, however, have found that allowing a merger to proceed does not constitute irreparable harm. See, e.g., <u>Negrin v. Short</u>, No. 96 Civil 112 (DLC), 1996 WL 349166 (S.D.N.Y. May 16, 1996) (noting that where "the individually named

plaintiffs [can] continue [their] lawsuit until a trial on the merits and prevail, the merger can be reversed … [and] the dilution of voting power, a necessary result of any merger, is not a cognizable harm.") (citing <u>Local 311 v. United Ass'n of Journeymen</u>, 130 LRRM 2063 (D. Conn. 1988)).

In addition, courts have been willing to acknowledge irreparable harm to defendant international unions due to the granting of a preliminary injunction preventing a merger from proceeding. <u>See</u> <u>Mason Tenders</u>, 924 F.Supp. at 543 (where the court identified that "[t]o permit the Locals to disregard the [international's] directives causes [the international] the 'substantial' hardship of depriving it of its right to self-governance in enforcing its constitution, to which the Locals are bound as subordinate bodies.").

The present case is most analogous to <u>San Filippo</u>, discussed <u>supra</u>, as the consolidation of members and assets do not constitute irreparable harm as Local 676 can be reconstituted and its assets restored should the Plaintiffs later succeed on the merits.  <u>See</u> <u>also</u> <u>Negrin,</u> <u>supra</u>.  In fact, Local 676's origin as former territorial jurisdiction of Local 669 in New England transferred for the purpose of creating a newly chartered sprinkler fitter local, demonstrates that the consolidation can be undone.  Indeed, given the rapid pace at which Local 676 is consuming its cash reserves, having consumed approximately 40% of its cash resources during the first six months of this litigation, [Prelim. Inj. Hearing, Doc. #76] the viability of Local 676 may be best assured by denying its application for a preliminary injunction.  As to the "loss of the union's proud history," the Court

does not find this argument convincing as the Plaintiffs cite no authority for this proposition, and further, its proud history will survive the merger as history is a record of past events which cannot later be altered.

Based on the foregoing, and In reliance upon the Defendants' representation that there would be nothing to preclude the Plaintiffs, especially the individual Plaintiffs, from pursuing an appeal of the UA's consolidation order, and this litigation [Def. Exh. #1; Prelim. Inj. Hearing, Doc. #76], the Court finds that the Plaintiffs have not made the requisite showing of irreparable harm.

The Court further finds that the Defendants would suffer irreparable harm in a manner analogous to the irreparable harm identified in <u>Mason Tenders</u>, should the injunction be granted. The Defendants' argument that an injunction would undermine their right to self-governance is valid, as granting a preliminary injunction would create an incentive for local unions to appeal all merger decisions to courts rather than following the union's constitutional procedures. The Defendants could also suffer harm by the depletion of assets by Local 676, which given the circumstances could likely not be recovered should the Defendants ultimately succeed.

The Court also notes that the Plaintiffs indicate, although not for the purpose of demonstrating a likelihood of irreparable harm, that Plaintiff Michael Livingstone and Local 676 "introduced evidence [during the August 24, 2009 consolidation hearing] that illustrated that apprenticeship programs in Connecticut are statutorily mandated outside of 676"s control and that a sponsor

of such a program must be 'permanently located within the State of Connecticut with recognized capability to operate an apprentice program'" [Doc. #41] and that "Livingstone pointed out that because Local 669 is located out of Maryland this would prove fatal to the apprenticeship program in Connecticut." [Id.].  In light of the potential risk of irreparable harm if the consolidation order resulted in the cancellation of the Local's apprenticeship program in Connecticut, the Court will consider this concern raised by Livingstone during the consolidation hearing.

Apprenticeship programs in Connecticut are required to have a sponsor, and The Regulations of Connecticut State Agencies Sec. 31-51d-2(k) states that: "'Sponsor' shall mean any duly established firm, association, committee, organization, or corporation permanently located within the State of Connecticut with recognized capability to operate an apprenticeship program in whose name the program is approved and registered."  CT ADC § 31-51-d-2(k). The Regulations further note that "[w]hen sponsor reorganization occurs, transfer of program obligations to the new entity is allowed when new organization is controlled by former principal officers or owners." CT ADC §  31-51-d-3(b).  The Plaintiffs have failed to demonstrate that the Connecticut-based members of the newly consolidated union, including current members of Local 676 would not be able to maintain a committee that qualifies as a sponsor under the statute. Further, the Regulations of Connecticut State Agencies also note that "[a]ny apprenticeship program deregistered may be reinstated upon presentation of adequate evidence that the apprenticeship program will operate in accordance

with registered standards with the department" further underscoring that even if a disruption occurred upon consolidation, such a disruption would not be permanent or irreparable in nature. CT ADC § 31-51-d-8.

As a final point, the Court recognizes that it is unusual for a motion for preliminary injunction to be ruled upon without an evidentiary hearing. See, Drywall Tapers, 954 F.2d at 77 (discussed by the Court supra);  See, also., Forts v. Ward, 566 F.2d 849, 851 (2d Cir. 1977).  This is especially true where affidavits evince disputed issues of fact.  Forts v. Ward, 566 F.2d at 851.  However, this Court also notes that an evidentiary hearing is not required in all cases to dispose of preliminary injunction motions.  See, e.g., SCM Corp. V. Xerox Corp., 507 F.2d 358 (2d Cir. 1974) (where the Circuit Court found that the district judge did not abuse his discretion in finding that the plaintiff had failed to make a sufficient showing of irreparable damage to justify an evidentiary hearing); Herbert Rosenthal Jewelry Corp. v. Grossbardt, 428 F.2d 551 (2d Cir. 1970) (where the Second Circuit noted an evidentiary hearing was unnecessary where key issues were "fully explored by the parties in the affidavits and depositions submitted on the motion."); Redac Project 6426, Inc. v. Allstate Ins. Co., 402 F.2d 789 (2d Cir. 1968) (where Second Circuit concluded that the trial court did not abuse its discretion by denying a motion for preliminary injunction without taking oral testimony).  Hunnicutt, 2010 WL 419407 (discussed by the Court supra).   As noted by the Second Circuit in Redac: "there is no hard and fast rule in this circuit that oral testimony must be taken on a motion for a preliminary injunction

or that the court can in no circumstances dispose of the motion on the papers before it." 402 F.2d at 790.

The Court notes that the parties have conducted in-depth discovery, submitted extensive briefings with deposition testimony on this matter, and presented arguments highlighting the evidentiary record during the August 31, 2010 hearing.  Furthermore, the Court invited counsel for the Plaintiffs to identify questions of fact for which the Plaintiffs' would introduce oral testimony at a fuller hearing in order to demonstrate irreparable injury. However counsel was unable to do so and instead conceded an absence of disputed issues of fact regarding the issue of irreparable harm.  The Court therefore finds that this is an appropriate case for disposition absent a fuller evidentiary hearing, as the Plaintiffs have failed to show irreparable harm.  Due to the Plaintiffs' failure to demonstrate irreparable harm, the Court need not address their likelihood of prevailing on the merits of its various claims.  The Plaintiffs' Motion for Preliminary Injunction [Doc. #5] is therefore DENIED.

IT IS SO ORDERED

_____/s/_____

Hon. Vanessa L. Bryant
United States District Judge

Dated at Hartford, Connecticut this 15th Day of September 2010